UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

      - v. -               :     <u>INDICTMENT</u>

JOSEPH BONGIORNO,           :     05 Cr.
PATRICK McGAGH,
MICHAEL HAYWARD,         :
MICHAEL STERN,
RICHARD VOLPE,
ROBERT SCAVONE, and
GERARD HAYES,           :

       Defendants.            :

- - - - - - - - - - - - - - - - - - x

**05CRIM. 390**

## COUNT ONE

(Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Relevant Persons And Entities

1.  At all times relevant to this Indictment, Van der Moolen Specialists USA, LLC ("VDM"), a subsidiary of international trading firm Van der Moolen Holding, NV, was a broker-dealer headquartered in New York, New York.  VDM was a member organization of the New York Stock Exchange ("NYSE"), a national securities exchange located in New York, New York.  At all times relevant to this Indictment, certain of VDM's employees functioned as specialists for NYSE-listed securities.

2.  VDM was established in or about July 1999 when Van der Moolen Holding, NV, acquired a majority interest in, and integrated the operations of, three previously separate NYSE

specialist member firms: Lawrence, O'Donnell, Marcus, LLC

("LOM"); Surnamer, Weissman & Co.; and Einhorn & Company.  In or

about August 2001, VDM also acquired specialist member firm

Scavone, McKenna, Cloud & Company.

     3.   JOSEPH BONGIORNO, the defendant, was a NYSE

specialist from in or about 1987 and at all times relevant to

this Indictment.  BONGIORNO was employed by VDM from its

formation in July 1999, and at LOM before it was integrated into

VDM.  BONGIORNO acted as the specialist for, among other

companies, Hewlett-Packard Co. ("HPQ") from in or about January

1999 through in or about April 2003.

     4.   PATRICK McGAGH, the defendant, was a NYSE

specialist from in or about 1994 and at all times relevant to

this Indictment.  McGAGH was employed by VDM from its formation

in July 1999, and at LOM before it was integrated into VDM.

McGAGH acted as the specialist for, among other companies, Nortel

Networks Corporation ("NT") from in or about January 1999 through

in or about January 2001; and Pfizer Inc. ("PFE") from in or

about May 2001 through in or about January 2002 and from in or

about April 2002 through in or about April 2003.

     5.   MICHAEL HAYWARD, the defendant, was a NYSE

specialist from in or about 1989 and at all times relevant to

this Indictment.  HAYWARD was employed by VDM since its formation

in July 1999, and at LOM before it was integrated into VDM.

2

HAYWARD acted as the specialist for, among other companies, Time Warner Inc. ("TWX") from in or about August 1999 through in or about January 2001; SPX Corporation ("SPW") from in or about January 1999 through in or about July 1999, from in or about March 2001 through in or about May 2001, and from in or about November 2001 through in or about February 2002; and Apache Corp. ("APA") from in or about March 2002 through in or about June 2003.

6.     MICHAEL STERN, the defendant, was a NYSE specialist from in or about 1983 and at all times relevant to this Indictment.  STERN was employed by VDM since its formation in July 1999, and at LOM before it was integrated into VDM. STERN acted as the specialist for, among other companies, Abercrombie & Fitch Co. ("ANF") from in or about January 1999 through in or about September 1999; PFE from in or about November 1999 through in or about May 2000; SPX Corporation ("SPW") from in or about November 2000 through in or about January 2001; Eli Lilly and Company ("LLY") from in or about October 2000 through in or about July 2001; Kohl's Corporation ("KSS") from in or about September 2001 through in or about September 2002; and Duke Energy Corporation ("DUK") from in or about October 2002 through in or about April 2003.

7.     RICHARD VOLPE, the defendant, was a NYSE specialist from in or about 1987 and at all times relevant to

this Indictment. VOLPE was employed by VDM from its formation in July 1999, and by Einhorn & Company before it was integrated into VDM. VOLPE acted as the specialist for, among other companies, LLY from in or about January 2000 through in or about April 2000; PFE from in or about June 2000 through in or about January 2001; and The Walt Disney Company ("DIS") from in or about June 2001 through in or about April 2003.

8. ROBERT SCAVONE, the defendant, was a NYSE specialist from in or about 1983 and at all times relevant to this Indictment. SCAVONE was employed by Scavone, McKenna, Cloud & Company, until its acquisition by VDM in or about August 2001, after which SCAVONE was employed by VDM. SCAVONE acted as the specialist for, among other companies, LLY from in or about August 2001 through in or about April 2003.

9. GERARD HAYES, the defendant, was a NYSE specialist from in or about 1991. HAYES was employed by VDM since its formation in July 1999, and by LOM before it was integrated into VDM. HAYES acted as the specialist for, among other companies, International Paper Co. ("IP") from in or about January 1999 through in or about June 2000, and April 2001 through April 2003; and DIS from in or about August 2000 through in or about February 2001.

10. At various times relevant to this Indictment, JOSEPH BONGIORNO, PATRICK McGAGH, MICHAEL HAYWARD, and MICHAEL

4

STERN, the defendants, were members of the VDM management committee that ran VDM's day-to-day operations.   BONGIORNO, HAYWARD, STERN, VOLPE, and SCAVONE had each also served as NYSE Floor Officials, responsible for supervising and regulating trading floor activities.   BONGIORNO had also served as one of twenty senior Floor Officials known as Floor Governors.   VOLPE, SCAVONE, and HAYES further served as VDM Floor Captains, responsible for supervising approximately five to six other specialists working near their posts.

### The Role Of NYSE Specialists

11.   With limited exceptions, purchases and sales of securities on the NYSE must be executed through a specialist who works on the floor of the exchange.   Each security listed for trading on the NYSE is assigned to a particular specialist and is traded through an assigned "post" on the floor of the exchange where the specialist works during the trading day.   To execute purchases and sales of a particular security, buyers and sellers must first present their bids to buy, and offers to sell, to the specialist assigned to that security.   At all times relevant to this Indictment, orders to purchase or sell securities could be presented to a specialist in one of two ways.   First, the order could be conveyed orally and in person to the specialist by a floor broker on the floor of the exchange at the specialist's post.   Second, an order could be transmitted to the specialist

5

electronically using the NYSE's Super Designated Order Turnaround
System ("Super DOT").  Orders transmitted over the Super DOT
system would appear on a special computer screen, often referred
to as the "display book."  Each specialist had a computerized
"display book" screen at his or her trading post.

      12.  After receiving an order to buy or sell a
security, the specialist could execute or "fill" the order in one
of two ways.  Generally, the specialist must match any open
orders to buy from one investor with an open order to sell from
another investor within the same price range.  Orders executed in
this manner are generally referred to as "agency" or "broker"
orders because the specialist simply acts as an agent matching
orders from willing buyers and willing sellers.  Specialists
generally received no compensation for executing trades on an
agency basis.  As discussed more fully below, specialists were
generally required by rules of the United States Securities and
Exchange Commission and the NYSE to execute trades on an agency
basis whenever possible.

      13.  In certain limited circumstances, specialists were
allowed to execute trades on a "principal" or "dealer" basis when
required to do so to maintain a fair and orderly market.  In such
circumstances, such as if there were no matching orders to sell
and orders to buy within the same price range at a given time,
the specialist was permitted to execute an investor's order to

buy stock by selling the stock from the specialist's proprietary account, or "inventory" of stock, to the investor. Conversely, the specialist was permitted to execute an investor's order to sell stock by buying that stock from the investor and holding the stock in the specialist's inventory.

14.   In addition to their responsibility for executing purchases and sales, specialists were also responsible for reporting to the public the prices at which stocks were being bought and sold. Because of their unique position and responsibilities, specialists had certain material information advantages over all other investors and brokers. Among other things, the specialists were the first to know the price parameters of all open orders. Because of these unique advantages, specialists were subject to special rules, discussed more fully below, to prevent them from taking unfair advantage of other investors and market participants.

### Certain Applicable Rules and Regulations

15.   Securities exchanges such as the NYSE are permitted to use specialists to execute orders pursuant to Section 11(b)(2) of the Securities and Exchange Act of 1934 ("the Exchange Act") and rules promulgated by the SEC thereunder. Pursuant to Exchange Act Rule 11b-1, securities exchanges must in turn have rules "stating the responsibilities of a specialist acting as a broker" as well as rules restricting a specialist's

7

principal transactions "so far as practicable to those reasonably necessary to permit him to maintain a fair and orderly market."

16.   At all relevant times, the NYSE had adopted, and had in force, rules which governed specialists' conduct and which imposed two primary duties in relation to executing orders for investors.  First, pursuant to NYSE Rule 104, specialists were required to buy and sell stock on a principal or dealer basis when reasonably necessary to maintain a "fair and orderly market," i.e., when necessary to minimize any actual or reasonably anticipated short-term imbalance between supply and demand, to facilitate price continuity, or to fill customer orders when there were no available contra parties to those orders.  The obligation imposed by this rule requiring a specialist to engage in principal transactions to maintain a fair and orderly market was referred to as the specialist's "affirmative obligation."

17.   Second, Rule 104 also imposed a "negative obligation" that prohibited specialists from buying or selling securities on a principal or dealer basis (i.e., for or from the specialist's inventory) "unless such dealings [were] reasonably necessary to permit such specialist to maintain a fair and orderly market."  As a general matter, fair and orderly markets existed, and therefore the specialist was precluded from buying or selling stock as a principal or dealer, when there were

8

matching public orders to buy and public orders to sell in the market within the same price parameters at the same time.   NYSE Rule 92(a) further specified that specialists were precluded from buying or selling securities on a principal or dealer basis if the specialist was aware of pending orders from investors at the same price.   Thus, specialists were prohibited from "trading ahead," in other words executing orders for their proprietary or dealer account ahead of existing, but as yet unexecuted, investor orders.

18.   In addition to its promulgated rules, the NYSE published a "Floor Official Manual" which was widely distributed to floor officials and specialists and which set forth "an overview of the Exchange's rules and policies and certain SEC rules which govern activity on the Floor of the Exchange."   In addition to describing the specialist's negative and affirmative obligations, the Floor Official Manual stated that:

> In view of the specialist's central position in the Exchange's continuous two-way agency auction market, a specialist should act as agent on behalf of orders entrusted to the specialist, hold the interests of such orders above the specialist's own interest, and properly represent each order regardless of its size or source in the marketplace to ensure the timely and best possible execution in accordance with the terms of the order and the rules and policies of the Exchange.

### **The Scheme To Defraud**

19.   From in or about January 1999 through in or about
April 2003, JOSEPH BONGIORNO, PATRICK McGAGH, MICHAEL HAYWARD,
MICHAEL STERN, RICHARD VOLPE, ROBERT SCAVONE, and GERARD HAYES,
in furtherance of a scheme to defraud purchasers and sellers of
stock on the NYSE, systematically violated NYSE rules and
breached their duties to refrain from buying and selling stock
for their proprietary or dealer accounts while in the possession
of executable customer buy and sell orders.  Instead, BONGIORNO,
McGAGH, HAYWARD, STERN, VOLPE, SCAVONE, and HAYES effected
improper proprietary trades at the expense of public orders by
"trading ahead" of those orders or "interpositioning" themselves
between these orders, as described below.

Trading Ahead

20.   When "trading ahead" of customer orders,
BONGIORNO, McGAGH, HAYWARD, STERN, VOLPE, SCAVONE, and HAYES
filled executable customer buy and sell orders through principal
trades from their dealer accounts "trading ahead" or "stepping in
front" of executable customer orders.  For example, in a
declining market, a specialist "trades ahead" by filling a market
buy order through selling stock from the specialist firm's
proprietary account at $25.05 per share, rather than by matching
it with an existing agency market sell order, and then filling
the agency sell order after the proprietary trade at a lower

10

price, such as $25.00 per share, as the price of the stock fell. By this conduct, BONGIORNO, McGAGH, HAYWARD, STERN, VOLPE, SCAVONE, and HAYES bought or sold stock for the dealer accounts at the most advantageous price available, then, after their proprietary trades, executed the agency orders with which they were entrusted at a less advantageous price than they received for their dealer accounts.

Interpositioning

21.  When "interpositioning" themselves between matchable, executable customer orders, BONGIORNO, McGAGH, HAYWARD, STERN, VOLPE, SCAVONE, and HAYES either (a) purchased stock for their proprietary accounts from the customer sell orders, and then filled the customer buy orders by selling from their proprietary accounts at a higher price, or (b) sold stock from their proprietary accounts to customer buy orders, and then filled customer sell orders by buying for their proprietary accounts at a lower price.  In both of these forms of improper trading practice, hereinafter referred to as "interpositioning," BONGIORNO, McGAGH, HAYWARD, STERN, VOLPE, SCAVONE, and HAYES profited by capturing the spread between the lower price at which they bought stock from customer sell orders and the higher price at which they sold stock to customer buy orders, and disadvantaged at least one of the parties to the transaction by buying or selling stock for the proprietary account at the most

11

advantageous price available and executing the customer orders at a less advantageous price.

22.   For example, if market orders are present on both sides of the market, and a stock is bid for $25.00 (purchase price) and offered at $25.05 (sale price), the specialist is obligated to pair the market orders at a price between $25.00 and $25.05.  If, instead, the specialist interpositions himself by buying from the sellers at $25.00 and selling to the buyers at $25.05, the specialist fraudulently and improperly profits from the five-cent spread in violation of the applicable NYSE rules.

23.   One factor considered in determining compensation of specialists at VDM was the profitability of the specialist's proprietary trading of the security to which he was the assigned specialist.  Accordingly, trading profits generated as a result of trading ahead and interpositioning had a positive effect on the specialist's compensation.

24.   During the period from in or about January 1999 through in or about April 2003, JOSEPH BONGIORNO caused over 15,620 instances of interpositioning, resulting in illegal profits to his dealer account of more than $1,380,000, and over 8,630 instances of trading ahead, resulting in more than $1,360,000 in customer harm.

25.   During the period from in or about January 1999 through in or about April 2003, PATRICK McGAGH caused over 21,290

instances of interpositioning, resulting in illegal profits to his dealer account of more than $3,430,000, and over 4,200 instances of trading ahead, resulting in more than $1,240,000 in customer harm.

26.   During the period from in or about January 1999 through in or about April 2003, MICHAEL HAYWARD caused over 5,210 instances of interpositioning, resulting in illegal profits to his dealer account of more than $690,000, and over 5,000 instances of trading ahead, resulting in more than $1,190,000 in customer harm.

27.   During the period from in or about January 1999 through in or about April 2003, MICHAEL STERN caused over 3,980 instances of interpositioning, resulting in illegal profits to his dealer account of more than $400,000, and over 5,250 instances of trading ahead, resulting in more than $630,000 in customer harm.

28.   During the period from in or about January 1999 through in or about April 2003, RICHARD VOLPE caused over 13,730 instances of interpositioning, resulting in illegal profits to his dealer account of more than $790,000, and over 5,270 instances of trading ahead, resulting in more than $600,000 in customer harm.

29.   During the period from in or about January 1999 through in or about April 2003, ROBERT SCAVONE caused over 3,710

13

instances of interpositioning, resulting in illegal profits to his dealer account of more than $197,000, and over 4,540 instances of trading ahead, resulting in more than $330,000 in customer harm.

30.   During the period from in or about January 1999 through in or about April 2003, GERARD HAYES caused over 2,280 instances of interpositioning, resulting in illegal profits to his dealer account of more than $150,000, and over 5,710 instances of trading ahead, resulting in more than $570,000 in customer harm.

## The Conspiracy

31.   From in or about January 1999 through in or about June 2003, in the Southern District of New York and elsewhere, JOSEPH BONGIORNO, PATRICK McGAGH, MICHAEL HAYWARD, MICHAEL STERN, RICHARD VOLPE, ROBERT SCAVONE, and GERARD HAYES, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, to commit securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Objects of the Conspiracy

### Securities Fraud

32.   It was a part and an object of the conspiracy that JOSEPH BONGIORNO, PATRICK McGAGH, MICHAEL HAYWARD, MICHAEL STERN, RICHARD VOLPE, ROBERT SCAVONE, and GERARD HAYES, the defendants, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would and did operate as a fraud and deceit upon persons who purchased and sold stock issued by NYSE-listed companies, and other persons and entities, in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

15

## Means and Methods of the Conspiracy

33.   Among the means and methods by which JOSEPH BONGIORNO, PATRICK McGAGH, MICHAEL HAYWARD, MICHAEL STERN, RICHARD VOLPE, ROBERT SCAVONE, and GERARD HAYES, the defendants, and others known and unknown, would and did carry out the conspiracy were the following:

a.   BONGIORNO, McGAGH, HAYWARD, STERN, VOLPE, SCAVONE, and HAYES caused trading ahead of executable customer orders.

b.   BONGIORNO, McGAGH, HAYWARD, STERN, VOLPE, SCAVONE, and HAYES caused interpositioning.

## Overt Acts

34.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   In or about July 2001, in New York, New York, JOSEPH BONGIORNO directed his trading assistant to execute a trade for his proprietary account ahead of executable customer orders, to the advantage of his proprietary account and to the disadvantage of customer orders.

b.   In or about August 2001, in New York, New York, PATRICK McGAGH directed his trading assistant to execute a trade for his proprietary account ahead of executable customer

16

orders, to the advantage of his proprietary account and to the disadvantage of customer orders.

      c.   In or about October 2001, in New York, New York, MICHAEL HAYWARD directed his trading assistant to execute a trade for his proprietary account ahead of executable customer orders, to the advantage of his proprietary account and to the disadvantage of customer orders.

      d.   In or about July 2002, in New York, New York, MICHAEL STERN directed his trading assistant to execute a trade for his proprietary account ahead of executable customer orders, to the advantage of his proprietary account and to the disadvantage of customer orders.

      e.   In or about June 2001, in New York, New York, RICHARD VOLPE directed his trading assistant to execute a trade for his proprietary account ahead of executable customer orders, to the advantage of his proprietary account and to the disadvantage of customer orders.

      f.   In or about April 2002, in New York, New York, ROBERT SCAVONE directed his trading assistant to execute a trade for his proprietary account ahead of executable customer orders, to the advantage of his proprietary account and to the disadvantage of customer orders.

      g.   In or about July 2002, in New York, New York, GERARD HAYES directed his trading assistant to execute a trade

for his proprietary account ahead of executable customer orders,
to the advantage of his proprietary account and to the
disadvantage of customer orders.

　　　　　h.　On or about October 9, 2002, at approximately
11:42 a.m. (EST), in New York, New York, JOSEPH BONGIORNO caused
interpositioning.　BONGIORNO's display book at 11:42:53 showed,
among other things, that at a price of $11.12, there were orders
to buy 7,100 HPQ shares and orders to sell 8,600 HPQ shares, all
of which had become simultaneously visible on BONGIORNO's display
book at 11:42:52.　Accordingly, at this price, orders for 7,100
shares of HPQ were matchable and should have been paired off
before BONGIORNO traded for VDM's proprietary account.　Rather
than pairing off these orders, BONGIORNO interpositioned between
them.　First, at 11:42:53, he sold 7,100 shares from the
specialist firm's proprietary account at a price of $11.12, ahead
of existing customer sell orders.　Next, BONGIORNO dropped the
price to $11.05 and at 11:42:58, he purchased 6,100 shares for
the specialist firm's proprietary account.　As a result,
BONGIORNO disadvantaged customer orders and profited
approximately $427 on the purchase and sale of 6,100 shares for
VDM, in approximately six seconds.

　　　　　i.　On or about November 6, 2002, at
approximately 2:15 p.m. (EST), in New York, New York, JOSEPH
BONGIORNO caused interpositioning.　BONGIORNO's display book at

2:15:35 showed, among other things, that at a price of $17.24, there were orders to buy 12,600 HPQ shares and orders to sell 33,500 HPQ shares, all of which had just simultaneously appeared on BONGIORNO's display book. Accordingly, at this price, orders for 12,600 shares of HPQ were matchable and should have been paired off before BONGIORNO traded for VDM's proprietary account. Rather than pairing off these orders, BONGIORNO interpositioned between them. First, at 2:15:40, he sold 12,600 shares from the specialist firm's proprietary account at a price of $17.24, ahead of existing customer sell orders. BONGIORNO subsequently dropped the price to $17.13 and at 2:15:46, he purchased 15,700 shares for the specialist firm's proprietary account. As a result, BONGIORNO disadvantaged customer orders and profited approximately $1,386 on the purchase and sale of 12,600 shares for VDM, in approximately 11 seconds.

   j. On or about October 17, 2002, at approximately 2:57 p.m. (EST), in New York, New York, PATRICK McGAGH caused interpositioning. McGAGH's display book at 2:57:56 showed, among other things, that at a price of $32.72, there were orders to buy 8,200 PFE shares and orders to sell 10,400 PFE shares, all of which had become simultaneously visible on McGAGH's display book at 2:57:54. Accordingly, at this price, orders for 8,200 shares of PFE were matchable and should have been paired off before McGAGH traded for VDM's proprietary

account.  Rather than pairing off these orders, McGAGH
interpositioned between them.  First, at 2:58:00, he purchased
10,400 shares for the specialist firm's proprietary account at a
price of $32.72, ahead of existing customer buy orders.  Next,
McGAGH raised the price to $32.79 and at 2:58:04, he sold 5,500
shares for the specialist firm's proprietary account.  As a
result, McGAGH disadvantaged customer orders and profited
approximately $385 on the purchase and sale of 5,500 shares for
VDM, in approximately ten seconds.

      k.   On or about November 29, 2002, at
approximately 12:56 p.m. (EST), in New York, New York, PATRICK
McGAGH caused interpositioning.  McGAGH's display book at
12:56:30 showed, among other things, that at a price of $31.56,
there were orders to buy 4,300 PFE shares and orders to sell
5,700 PFE shares, all of which had just simultaneously appeared
on McGAGH's display book.  Accordingly, at this price, orders for
4,300 shares of PFE were matchable and should have been paired
off before McGAGH traded for VDM's proprietary account.  Rather
than pairing off these orders, McGAGH interpositioned between
them.  First, at 12:56:31, he sold 4,300 shares from the
specialist firm's proprietary account at a price of $31.56, ahead
of existing customer sell orders.  Next, McGAGH dropped the price
to $31.53 and at 12:56:32, he purchased 3,700 shares for the
specialist firm's proprietary account.  As a result, McGAGH

disadvantaged customer orders and profited approximately $111 on the purchase and sale of 3,700 shares for VDM, in approximately two seconds.

        l.   On or about October 9, 2002, at approximately 9:46 a.m. (EST), in New York, New York, MICHAEL HAYWARD caused interpositioning.  At approximately 9:46:29, a market order to buy 500 shares of APA and a market order to sell 600 shares of APA appeared simultaneously on HAYWARD's display book.  HAYWARD's display book at 9:46:31 showed, among other things, that at a price of $54.94, there were orders to buy 500 APA shares and orders to sell 600 APA shares.  Accordingly, at this price, orders for 500 shares of APA were matchable and should have been paired off before HAYWARD traded for VDM's proprietary account.  Rather than pairing off these orders, HAYWARD interpositioned between them.  First, at 9:46:32, he sold 500 shares from the specialist firm's proprietary account at a price of $54.94, ahead of existing customer sell orders.  Next, HAYWARD dropped the price to $54.85 and at 9:46:33, he purchased 600 shares for the specialist firm's proprietary account.  As a result, HAYWARD disadvantaged customer orders and profited approximately $45 on the purchase and sale of 500 shares for VDM, in approximately four seconds.

        m.   On or about November 13, 2002, at approximately 2:27 p.m. (EST), in New York, New York, MICHAEL

HAYWARD caused interpositioning.  HAYWARD's display book at
2:27:23 showed, among other things, that at a price of $49.52,
there were orders to buy 2,900 APA shares and orders to sell
2,000 APA shares, all of which had just simultaneously appeared
on HAYWARD's display book.  Accordingly, at this price, orders
for 2,000 shares of APA were matchable and should have been
paired off before HAYWARD traded for VDM's proprietary account.
Rather than pairing off these orders, HAYWARD interpositioned
between them.  First, at 2:27:24, he purchased 2,000 shares for
the specialist firm's proprietary account at a price of $49.52,
ahead of existing customer buy orders.  Next, HAYWARD raised the
price to $49.68 and at 2:27:28, he sold 1,400 shares from the
specialist firm's proprietary account.  As a result, HAYWARD
disadvantaged customer orders and profited approximately $224 on
the purchase and sale of 1,400 shares for VDM, in approximately
five seconds.

          n.   On or about October 18, 2002, at
approximately 3:49 p.m. (EST), in New York, New York, MICHAEL
STERN caused interpositioning.  At approximately 3:49:04, a
market order to buy 2,700 shares of DUK and a market order to
sell 2,600 shares of DUK appeared simultaneously on STERN's
display book.  STERN's display book at 3:49:06 showed, among
other things, that at a price of $20.24, there were orders to buy
3,000 DUK shares and orders to sell 2,600 DUK shares.

Accordingly, at this price, orders for 2,600 shares of DUK were matchable and should have been paired off before STERN traded for VDM's proprietary account. Rather than pairing off these orders, STERN interpositioned between them. First, at 3:49:08, he purchased 2,500 shares for the specialist firm's proprietary account at a price of $20.24, ahead of existing customer buy orders. Next, STERN raised the price to $20.29 and at 3:49:10, he sold 2,800 shares from the specialist firm's proprietary account. As a result, STERN disadvantaged customer orders and profited approximately $125 on the purchase and sale of 2,500 shares for VDM, in approximately six seconds.

o.    On or about January 9, 2003, at approximately 10:52 a.m. (EST), in New York, New York, MICHAEL STERN caused interpositioning. STERN's display book at 10:52:46 showed, among other things, that at a price of $21.44, there were orders to buy 4,400 DUK shares and orders to sell 23,300 DUK shares, all of which had just appeared simultaneously on STERN's display book. Accordingly, at this price, orders for 4,400 shares of DUK were matchable and should have been paired off before STERN traded for VDM's proprietary account. Rather than pairing off these orders, STERN interpositioned between them. First, at 10:52:50, he sold 4,400 shares from the specialist firm's proprietary account at a price of $21.44, ahead of existing customer sell orders. STERN subsequently dropped the price to $21.33 and at 10:52:59, he

purchased 1,500 shares for the specialist firm's proprietary account. As a result, STERN disadvantaged customer orders and profited approximately $165 on the purchase and sale of 1,500 shares for VDM, in approximately 13 seconds.

p.   On or about November 19, 2002, at approximately 2:49 p.m. (EST), in New York, New York, RICHARD VOLPE caused interpositioning. At approximately 2:49:05, a market order to buy 5,000 shares of DIS and market orders to sell 4,100 shares of DIS appeared simultaneously on VOLPE's display book. VOLPE's display book at 2:49:08 showed, among other things, that at a price of $18.28, there were orders to buy 6,000 DIS shares and orders to sell 4,100 DIS shares. Accordingly, at this price, orders for 4,100 shares of DIS were matchable and should have been paired off before VOLPE traded for VDM's proprietary account. Rather than pairing off these orders, VOLPE interpositioned between them. First, at 2:49:11, he purchased 3,100 shares for the specialist firm's proprietary account at a price of $18.28, ahead of existing customer buy orders. Next, VOLPE raised the price to $18.33 and at 2:49:14, he sold 4,300 shares from the specialist firm's proprietary account. As a result, VOLPE disadvantaged customer orders and profited approximately $155 on the purchase and sale of 3,100 shares for VDM, in approximately nine seconds.

24

q.   On or about November 26, 2002, at
approximately 10:59 a.m. (EST), in New York, New York, RICHARD
VOLPE caused interpositioning.  VOLPE's display book at 10:59:28
showed, among other things, that at a price of $19.30, there were
orders to buy 4,200 DIS shares and orders to sell 4,500 DIS
shares, all of which had simultaneously appeared on VOLPE's
display book at 10:59:23.  Accordingly, at this price, orders for
4,200 shares of DIS were matchable and should have been paired
off before VOLPE traded for VDM's proprietary account.  Rather
than pairing off these orders, VOLPE interpositioned between
them.  First, at 10:59:31, he sold 3,900 shares for the
specialist firm's proprietary account at a price of $19.30, ahead
of existing customer sell orders.  Next, VOLPE dropped the price
to $19.25 and at 10:59:34, he purchased 3,300 shares from the
specialist firm's proprietary account.  As a result, VOLPE
disadvantaged customer orders and profited approximately $165 on
the purchase and sale of 3,300 shares for VDM, in approximately
11 seconds.

r.   On or about November 25, 2002, at
approximately 1:14 p.m. (EST), in New York, New York, ROBERT
SCAVONE caused interpositioning.  SCAVONE's display book at
1:14:29 showed, among other things, that at a price of $66.88,
there were orders to buy 3,300 LLY shares and orders to sell
1,200 LLY shares, a majority of which had just simultaneously

25

appeared on SCAVONE's display book.  Accordingly, at this price,
orders for 1,200 shares of LLY were matchable and should have
been paired off before SCAVONE traded for VDM's proprietary
account.  Rather than pairing off these orders, SCAVONE
interpositioned between them.  First, at 1:14:32, he purchased
1,200 shares for the specialist firm's proprietary account at a
price of $66.88, ahead of existing customer buy orders.  Next,
SCAVONE raised the price to $66.93 and at 1:14:36, he sold 2,500
shares from the specialist firm's proprietary account.  As a
result, SCAVONE disadvantaged customer orders and profited
approximately $60 on the purchase and sale of 1,200 shares for
VDM, in approximately seven seconds.

        s.  On or about November 27, 2002, at
approximately 2:41 p.m. (EST), in New York, New York, ROBERT
SCAVONE caused interpositioning.  SCAVONE's display book at
2:41:30 showed, among other things, that at a price of $68.89,
there were orders to buy 1,500 LLY shares and orders to sell
5,700 LLY shares, all of which had just simultaneously appeared
on SCAVONE's display book.  Accordingly, at this price, orders
for 1,500 shares of LLY were matchable and should have been
paired off before SCAVONE traded for VDM's proprietary account.
Rather than pairing off these orders, SCAVONE interpositioned
between them.  First, at 2:41:32, he sold 1,500 shares from the
specialist firm's proprietary account at a price of $68.89, ahead

of existing customer sell orders.  Next, SCAVONE dropped the price to $68.83 and at 2:41:35, he purchased 1,600 shares for the specialist firm's proprietary account.  As a result, SCAVONE disadvantaged customer orders and profited approximately $90 on the purchase and sale of 1,500 shares for VDM, in approximately five seconds.

t.   On or about October 15, 2002, at approximately 10:13 a.m. (EST), in New York, New York, GERARD HAYES caused interpositioning.  HAYES's display book at 10:13:24 showed, among other things, that at a price of $36.16, there were orders to buy 4,200 IP shares and orders to sell 2,500 IP shares, all of which had simultaneously appeared on HAYES's display book at 10:13:20.  Accordingly, at this price, orders for 2,500 shares of IP were matchable and should have been paired off before HAYES traded for VDM's proprietary account.  Rather than pairing off these orders, HAYES interpositioned between them.  First, at 10:13:26, he purchased 2,500 shares for the specialist firm's proprietary account at a price of $36.16, ahead of existing customer buy orders.  HAYES subsequently raised the price to $36.40 and at 10:13:56, he sold 3,600 shares from the specialist firm's proprietary account.  As a result, HAYES disadvantaged customer orders and profited approximately $600 on the purchase and sale of 2,500 shares for VDM, in approximately 36 seconds.

u.   On or about November 20, 2002, at
approximately 12:01 p.m. (EST), in New York, New York, GERARD
HAYES caused interpositioning.  HAYES's display book at 12:01:08
showed, among other things, that at a price of $36.30, there were
orders to buy 3,000 IP shares and orders to sell 2,400 IP shares,
all of which had simultaneously appeared on HAYES's display book
at 12:01:07.  Accordingly, at this price, orders for 2,400 shares
of IP were matchable and should have been paired off before HAYES
traded for VDM's proprietary account.  Rather than pairing off
these orders, HAYES interpositioned between them.  First, at
12:01:10, he sold 3,000 shares from the specialist firm's
proprietary account at a price of $36.30, ahead of existing
customer sell orders.  HAYES subsequently dropped the price to
$36.25 and at 12:01:13, he purchased 2,200 shares for the
specialist firm's proprietary account.  As a result, HAYES
disadvantaged customer orders and profited approximately $110 on
the purchase and sale of 2,200 shares for VDM, in approximately
six seconds.

(Title 18, United States Code, Section 371).

## COUNTS TWO THROUGH FIFTEEN

(Securities Fraud)

The Grand Jury further charges:

35. The allegations of paragraphs 1 through 30, and 33 through 34 are repeated and realleged as though fully set forth herein.

36. On or about the dates set forth below, in the Southern District of New York and elsewhere, the defendants set forth below, unlawfully, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would and did operate as a fraud and deceit upon

persons, in connection with the purchase and sale of stock issued by the following NYSE-listed companies:

| COUNT | DEFENDANT | APPROX. DATES | COMPANY |
|---|---|---|---|
| TWO | JOSEPH BONGIORNO | January 1999 through April 2003 | Hewlett-Packard Co. |
| THREE | PATRICK McGAGH | January 1999 through January 2001 | Nortel Networks Corporation |
| FOUR | PATRICK McGAGH | May 2001 through January 2002, and April 2002 through April 2003 | Pfizer, Inc. |
| FIVE | MICHAEL HAYWARD | March 2002 through April 2003 | Apache Corp. |
| SIX | MICHAEL HAYWARD | March 2001 through May 2001, and November 2001 through February 2002 | SPX Corporation |
| SEVEN | MICHAEL HAYWARD | August 1999 through January 2001 | Time Warner Inc. |
| EIGHT | MICHAEL STERN | October 2002 through April 2003 | Duke Energy Corporation |
| NINE | MICHAEL STERN | September 2001 through September 2002 | Kohls Corporation |
| TEN | MICHAEL STERN | October 2000 through July 2001 | Eli Lilly and Company |
| ELEVEN | RICHARD VOLPE | June 2001 through April 2003 | The Walt Disney Company |
| TWELVE | RICHARD VOLPE | June 2000 through January 2001 | Pfizer, Inc. |

30

| THIRTEEN | ROBERT SCAVONE | August 2001 through April 2003 | Eli Lilly and Company |
| FOURTEEN | GERARD HAYES | April 2001 through April 2003 | International Paper Co. |
| FIFTEEN | GERARD HAYES | August 2000 through February 2001 | The Walt Disney Company |

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

FOREPERSON

DAVID N. KELLEY
United States Attorney

31